In the

# United States Court of Appeals

## For the Seventh Circuit

———————

No. 20-1906

PLATINUM SUPPLEMENTAL INSURANCE, INC.,

*Plaintiff-Appellee,*

*v.*

GUARANTEE TRUST LIFE INSURANCE COMPANY,

*Defendant-Appellant.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 17-cv-08872 & 18-cv-03109 — **Robert M. Dow, Jr.**, *Judge.*

———————

ARGUED JANUARY 13, 2021 — DECIDED MARCH 2, 2021

———————

Before FLAUM, BRENNAN, and SCUDDER, *Circuit Judges.*

FLAUM, *Circuit Judge.* The current dispute is the latest in a string of lawsuits involving plaintiff Platinum Supplemental Insurance, Inc. ("Platinum") and defendant Guarantee Trust Life Insurance Company ("GTL"). In 2002, GTL and Platinum began their professional relationship when GTL engaged Platinum to market its insurance products through a "Marketing Agreement." After a customer sued both parties in a costly lawsuit, GTL terminated the Marketing Agreement.

The parties then entered their first settlement agreement, the "2015 Settlement Agreement." Around the same time, GTL sued Platinum for breaching the Marketing Agreement. In arbitration, GTL and Platinum settled their disputes in a second settlement agreement, the "2017 Settlement Agreement." That agreement resolved all their claims that had and could have been brought in that litigation. It further provided for "reasonably proportionate" attorneys' fees to the prevailing party in any future litigation.

Two and a half months before the parties executed the 2017 Settlement Agreement, another customer had sued GTL in Missouri. After the 2017 Settlement Agreement took effect, GTL filed a third-party complaint against Platinum in that Missouri lawsuit based on claims that Platinum breached the Marketing Agreement. In turn, Platinum sued GTL in the district court because the claims in the third-party complaint mirrored those already resolved by the 2017 Settlement Agreement and were therefore barred. The district court granted Platinum summary judgment and awarded it $108,445.10 in attorneys' fees—or 150% of the underlying damages award. We affirm the district court's grant of summary judgment because the 2017 Settlement Agreement bars the claims in GTL's third-party complaint. We also affirm the grant of attorneys' fees because the award is "reasonably proportionate" to the underlying damages.

## I.    Background

Platinum markets and sells insurance policies. GTL is a mutual reserve company that underwrites insurance policies. In 2002, Platinum and GTL entered into the Marketing Agreement for Platinum to exclusively market and sell certain insurance products underwritten by GTL. Section 17 of the

Marketing Agreement contained an arbitration clause requiring all disputes arising from the Marketing Agreement to "be submitted to binding, non-appealable arbitration." The agreement also contained an indemnification clause stating that Platinum would indemnify GTL for any liability connected to its conduct governed by the Marketing Agreement. Finally, the Marketing Agreement incorporated GTL's Advertising Policy and Code of Ethical Market Conduct by reference.

Platinum and GTL's business relationship began to deteriorate when both parties were sued in Colorado by a dissatisfied customer. Platinum had engaged Joanna Gaylord as one of its "Independent Solicitors."[1] Gaylord made a presentation to Michael Casper in August 2010. Casper expressed concerns that prior arterial blockages in his legs would disqualify him from coverage as advertised, but Gaylord reassured him he would be covered. Consequently, Casper bought the policy, only to have GTL later deny him benefits when he was diagnosed with prostate cancer.

This denial of benefits gave rise to a Colorado state court lawsuit, the "Casper Litigation," in which Casper sued GTL for unreasonable denial of benefits and breach of contract. As part of this lawsuit, Casper also sued Gaylord and Platinum for negligent misrepresentation and fraud connected to their marketing of the policy he bought, but he settled with both. The case therefore went to trial as to GTL, which revealed that

---

[1] Platinum could procure applications for GTL's insurance policies through "Independent Solicitors," defined in the Marketing Agreement as "licensed brokers, agents, sub-agents, marketing companies or any entity that has authority to act as agent or broker who is legally authorized to legally solicit insurance in a particular state and is appointed with the state by GTL."

Platinum had used aggressive marketing tactics and certain materials that GTL had not pre-approved, as required under the Marketing Agreement. The trial court directed a verdict for Casper on his breach of contract claim against GTL. The jury then awarded him $1,716,799.40, and the court awarded $281,197.00 in attorneys' fees.

GTL terminated the Marketing Agreement effective July 17, 2015, because of Platinum's misconduct precipitating the Casper Litigation, and the parties entered into the 2015 Settlement Agreement to begin to resolve the disputes between them. The 2015 Settlement Agreement contained an arbitration clause providing that any disputes must be "resolved through arbitration as delineated in the Marketing Agreement." However, section 10 of the 2015 Settlement Agreement specifically listed "Excluded Matters" that were "not intended to be encompassed by this Settlement Agreement," meaning those matters could later be brought in litigation. Listed exclusions included "[s]uch indemnification rights as GTL may have, if any, arising out of existing and future claims as may from time to time be asserted against GTL attributable to the conduct of Platinum agents, brokers and representatives in connection with the offering and sale of insurance policies."

In December 2015, with the Casper Litigation still unfolding, GTL sued Platinum and its president and chief executive officer, Wayne A. Briggs, in the Circuit Court of Cook County, the "Cook County Litigation," for fraud, breach of contract, and breach of fiduciary duty, asking for rescission of the Marketing Agreement. The seven-count complaint alleged, *inter alia*, breaches of the Marketing Agreement and various common law duties connected to Platinum's training and

supervision of its agents marketing GTL's insurance policies and a violation of GTL's Advertising Policy and Code of Ethical Market Conduct. One allegation, for example, posited that Platinum "recklessly disregarded that its supervision, management and training of its employees and the Independent Solicitors created the risk that applications would not be solicited and procured in compliance with all applicable local, state and federal laws and regulations and/or any rules and requirements established by GTL." GTL thus sought all damages for what it "suffered, and continues to suffer, as a direct and proximate result of Platinum's breaches of the Marketing Agreement." Specifically, GTL sought "the loss of use of amounts GTL paid in compensation and commissions to Platinum for services that it was obligated to, but did not provide; i.e., the solicitation and procurement of applications in compliance with all applicable local, state and federal laws and regulations and any rules and requirements established by GTL."

On a motion by Platinum and Briggs, the state trial court compelled GTL and Platinum to arbitrate their dispute, invoking the arbitration clauses from both the then-terminated Marketing Agreement and the 2015 Settlement Agreement.[2] The Illinois Appellate Court affirmed that decision. GTL filed a petition for leave to appeal to the Illinois Supreme Court, but in the interim the parties reached a new settlement, the 2017 Settlement Agreement, rendering the petition moot.

The Circuit Court of Cook County approved the 2017 Settlement Agreement and dismissed the action with prejudice

---

[2] The counts brought against Briggs were stayed pending the arbitration between GTL and Platinum because GTL had no contract with Briggs.

on March 31, 2017, stating the "parties agree that all claims that were filed or could have been filed in the Cook County litigation shall be deemed settled and resolved." The 2017 Settlement Agreement itself contained nearly identical language: "all claims that were filed or could have been filed in the Cook County litigation shall be deemed to be settled and resolved by this AGREEMENT." Relevant on appeal, the agreement also rescinded section 10 of the 2015 Settlement Agreement, terminating GTL's previous reservation of the right to pursue indemnification claims through litigation. It further provided that "[t]he Parties agree that the prevailing Party in any lawsuit brought to enforce this Agreement shall be awarded its reasonable costs and attorneys' fees, but such an award must be reasonably proportionate to the ultimate relief secured by the prevailing Party."

On the tail end of the Cook County Litigation, on December 8, 2016, GTL-insured Thomas Grisham brought another lawsuit against GTL in federal court in Missouri, the "Missouri Litigation." He sued for: breach of contract for GTL improperly refusing to pay benefits owed to Grisham under a policy sold by Platinum and underwritten by GTL; defamation by GTL; and, under Missouri statutory law, a "vexatious refusal to pay." This lawsuit arose two and a half months before the 2017 Settlement Agreement's approval and the related dismissal of the Cook County Litigation in March 2017.

In October 2017, several months after the parties entered into the 2017 Settlement Agreement, GTL responded in the Missouri Litigation by filing a third-party complaint against Platinum for indemnification and contribution based on Platinum's alleged breaches of the Marketing Agreement and

Fraud.[3] GTL alleged that Platinum failed to ensure its contractors' compliance with applicable "laws and regulations," GTL's "rules, guidelines, and requirements" for advertising its insurance products, and GTL's Code of Ethical Market Conduct.

We now arrive at the instant lawsuit, which began when Platinum, invoking diversity jurisdiction, sued GTL in the Northern District of Illinois alleging that GTL breached the 2017 Settlement Agreement by filing the third-party complaint in the Missouri Litigation. Platinum then moved for summary judgment, arguing the claims for contribution and indemnification in the third-party complaint are barred by the 2017 Settlement Agreement because they could have been filed in the Cook County Litigation and because res judicata applied. The district court found for Platinum on both grounds. Securing this favorable judgment, Platinum invoked the 2017 Settlement Agreement to file a fee petition for "reasonably proportionate" attorneys' fees. The district court accepted briefing from both parties and awarded Platinum $108,445.10 in attorneys' fees.

## II.   Discussion

### A. Summary Judgment

The first issue on appeal is whether the district court's grant of summary judgment was proper. "We review a district court's summary judgment ruling de novo and consider the facts and draw all inferences in the light most favorable to the nonmoving party." *Troyer v. Nat'l Futures Ass'n*, 981 F.3d

---

[3] At some point, GTL and Grisham settled the underlying dispute in the Missouri Litigation, leaving only the dispute between GTL and Platinum in the third-party complaint.

612, 615 (7th Cir. 2020). Summary judgment is proper where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The district court granted summary judgment on two independent bases: that (1) the 2017 Settlement Agreement and (2) res judicata barred GTL's claims. We reach only the district court's first conclusion that GTL's claims in its third-party complaint were barred under the 2017 Settlement Agreement because those claims "could have been filed in the Cook County litigation."

We are called upon to interpret the meaning of the 2017 Settlement Agreement, which by its own terms "shall be construed under the law of the State of Illinois." Under Illinois law, "a settlement agreement is considered a contract, and construction and enforcement of settlement agreements are governed by principles of contract law." *Cannon v. Burge*, 752 F.3d 1079, 1088 (7th Cir. 2014) (citing *Cushing v. Greyhound Lines, Inc.*, 991 N.E.2d 28, 92 (Ill. App. Ct. 2013)). Likewise, contract law governs a release within a settlement agreement. *See id.* (citing *Farm Credit Bank of St. Louis v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991); *Rakowski v. Lucente*, 472 N.E.2d 791, 794 (Ill. 1984)). "Where a written agreement is clear and explicit, a court must enforce the agreement as written. Both the meaning of the instrument, and the intention of the parties must be gathered from the face of the document without the assistance of parol evidence or any other extrinsic aids." *Rakowski*, 472 N.E.2d at 794. "[T]he question of whether a contract is clear or ambiguous is a question of law for the court." *Omnitrus Merging Corp. v. Ill. Tool Works, Inc.*, 628 N.E.2d 1165, 1168 (Ill. App. Ct. 1993).

We hold that the 2017 Settlement Agreement unambiguously resolved "all claims that were filed or could have been filed in the Cook County litigation" and that this broad language encompassed the claims brought in GTL's third-party complaint against Platinum in the Missouri Litigation. In reaching this conclusion, we begin narrowly with the plain language of that release before expanding our analysis to other contractual provisions evidencing the parties' intent to have broadly released GTL's claims.

*1. The release itself is unambiguous.*

"Illinois uses in general a 'four corners' rule in the interpretation of contracts, holding … that 'if the language of a contract appears to admit of only one interpretation, the case is indeed over.'" *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (quoting *AM Int'l, Inc. v. Graphic Mgmt. Assocs., Inc.*, 44 F.3d 572, 574 (7th Cir. 1995)); *see also Thompson v. Gordon*, 948 N.E.2d 39, 47 (Ill. 2011) ("If the words in the contract are clear and unambiguous, they must be given their plain, ordinary and popular meaning."). Ambiguity only arises in a contract "if it is capable of being understood in more than one sense." *Cannon*, 752 F.3d at 1089 (citing *Whitlock*, 581 N.E.2d at 667; *Farmers Auto. Ins. Ass'n v. Kraemer*, 857 N.E.2d 691, 693 (Ill. App. Ct. 2006)).

Logically, the "plain, ordinary and popular meaning" of the broad, unqualified language of the release entails a broad, unqualified release of claims. *See Thompson*, 948 N.E.2d at 47. In fact, we cannot conceive of how "all claims that were filed or could have been filed" could be construed as anything but "clear and explicit," as the phrase is not "capable of being understood in more than one sense." *Cannon*, 752 F.3d at 1089. The language means precisely what it says: the parties have

resolved all claims that "were filed or could have been filed." Admitting of only one interpretation, the issue, then, "is indeed over." *Bourke*, 159 F.3d at 1036.

The parties can, and do, debate whether the claims in the third-party complaint fall within this phrase's reach (i.e., whether those claims in fact "could have been filed"). That dispute is not one of interpretation or ambiguity, however, but rather one of the appropriate application of this otherwise clear language. Stated differently, if GTL could in fact have brought its claims from the third-party complaint in the Cook County Litigation, then the language of the 2017 Settlement Agreement would unquestionably bar GTL from bringing those claims now, an assertion GTL cannot genuinely dispute.

That leaves only one question: whether GTL could have brought its claims in the Cook County Litigation. In short, the 2017 Settlement Agreement settled GTL's claims about Platinum breaching the Marketing Agreement by failing to ensure its employees conducted themselves honestly and fairly. In all meaningful respects, the third-party complaint encapsulated the same claims, alleging that Platinum failed to ensure its employees conducted themselves honestly and fairly. Therefore, GTL "could have" brought—indeed, likely actually brought—the claims from the third-party complaint in the earlier Cook County Litigation.

Parsing the specific claims brought in each suit highlights the relevant similarities. In the Cook County Litigation, GTL sued Platinum under broad breach of contract and fraud claims: "Platinum materially breached its contractual obligations under the Marketing Agreement by failing to ensure that its employees and the Independent Solicitors solicited and procured applications in accordance GTL's Advertising

Policy and Code of Ethical Market Conduct so as to avoid exposing GTL to claims similar to those made in the Casper Lawsuit." The referenced Advertising Policy and Code of Ethical Market Conduct required that marketers, like Platinum, be "honest and fair," "engage in fair competition," and engage in "fair dealing and good faith." GTL essentially claimed in the Cook County Litigation that Platinum failed to live up to these shared expectations in supervising its employees and Independent Solicitors. Based on these claims, GTL sought damages for the injuries it "suffered, and continues to suffer, as a direct and proximate result of Platinum's breaches of the Marketing Agreement."

Next, in GTL's third-party complaint against Platinum in the Missouri Litigation, GTL repeated that Platinum must ensure its agents "compl[y] with all local, state, and federal laws and regulations" and that Platinum would ensure its "agents … comply with[] all of GTL's company procedures and rules concerning advertising policies, marketing guidelines, and GTL's code of ethical market conduct." GTL then sought indemnification because Platinum made "certain negligent misrepresentations concerning [Grisham's] answers to an insurance policy application." GTL complained of Platinum "negligent[ly] supervising and monitoring its agents in the marketing and selling of insurance policies." GTL also alleged Platinum and or its agents made "intentional actions or omissions in the solicitation and procurement of the insurance policy application of [Grisham]." While some of these claims were colored in terms of the specific facts leading to Grisham's dispute, at base, the claims in the third-party complaint contended that Platinum negligently trained and supervised its employees and agents, which breached the

Marketing Agreement, violated GTL's ethical and marketing rules, and led to the sale of GTL's products in improper ways.

GTL thus brought claims against Platinum in both suits that swept more broadly than the particulars of Platinum's alleged misconduct connected to the specific insurance policies sold to Casper or Grisham. Even those claims that centered on facts specific to Grisham's lawsuit still "could have been filed in the Cook County litigation" because, as discussed below, GTL knew of those claims at the time it entered the 2017 Settlement Agreement. Accordingly, GTL is now barred by the 2017 Settlement Agreement from bringing those claims.

On appeal, GTL urges a crimped and unconvincing interpretation of the 2017 Settlement Agreement. GTL argues that the agreement elsewhere provides that "GTL's Cook County lawsuit and all appeals related to that lawsuit shall hereinafter be referred to as the 'Cook County litigation.'" GTL asserts that this definition of "Cook County litigation" does not include arbitration, thus limiting the agreement's reach. In GTL's view, once the court compelled the Cook County Litigation to arbitration, all the claims alleged therein accordingly arose not in "litigation" but in a separate and distinct arbitration. GTL therefore contends that it could not have brought the third-party complaint claims in the Cook County Litigation, and the 2017 Settlement Agreement does not bar them now.

We "will not interpret a contract in a manner that would nullify or render provisions meaningless, or in a way that is contrary to the plain and obvious meaning of the language used." *Thompson*, 948 N.E.2d at 47. GTL's argument implies there were never any claims brought *in litigation* because the claims in the Cook County Litigation were moved to an

arbitral forum. It goes without saying, if we deemed all the claims filed in the complaint to the Circuit Court of Cook County as not "filed in the Cook County litigation" because the state court later compelled the parties to arbitrate the matter, then we would undermine the release in its entirety; the release would reach zero claims and have no effect. We decline to assume the parties intended to include such a "meaningless" provision. *See id.*

Furthermore, contrary to GTL's proposition, the specific reference to the Cook County Litigation in the 2017 Settlement Agreement, without more, does not automatically limit the scope of GTL's release of its claims against Platinum. *See Crosby v. City of Chicago*, 949 F.3d 358, 361 (7th Cir. 2020) (rejecting the argument that "an agreement's reference to a specific claim always limits an otherwise general release to only the claim mentioned"). The release of "all claims that were filed or could have been filed in the Cook County litigation" is of course constrained by "Cook County litigation." If GTL had brought claims that it could *not* have brought in the Cook County Litigation, then the release would clearly not impede GTL's pursuit of those claims. We need not entertain that counterfactual because the third-party complaint claims "could have been filed in the Cook County litigation," barring GTL's pursuit of them now.

> 2. *Other provisions of the 2017 Settlement Agreement confirm that the release is unambiguous.*

Our analysis could end here, but GTL attempts to make ambiguous the otherwise clear release in the 2017 Settlement Agreement based on other contractual provisions that, in GTL's view, illustrate a contrary intent by the parties. As Illinois courts have said: "The scope and effect of a release are

controlled by the intention of the parties. Particularly with a release, this intent is discerned from the language used *and the circumstances of the transaction*." *Farmers Auto.*, 857 N.E.2d at 694 (citations and internal quotation marks omitted). "The intention of the parties to contract must be determined from the instrument itself, and construction of the instrument where no ambiguity exists is a matter of law." *Whitlock*, 581 N.E.2d at 667. We therefore examine the rest of the instrument before us and hold that its relevant provisions conform with and reinforce our view that the parties intended for GTL to broadly release its claims against Platinum, including the claims at issue here. Accordingly, the 2017 Settlement Agreement is unambiguous, and GTL is barred from bringing those claims.

Beyond the plain text of the release, we glean strong evidence of the parties' intent from their decision in the 2017 Settlement Agreement to excise the indemnification exclusion from the 2015 Settlement Agreement. Initially, in section 10 of the 2015 Settlement Agreement, the parties specifically excluded from the agreement "existing and future claims" of indemnification GTL may have against Platinum. In other words, GTL reserved its right to later sue Platinum for indemnification.

Yet, in the 2017 Settlement Agreement, GTL and Platinum reversed course when they expressly terminated section 10 from the 2015 Settlement Agreement, indicating a new understanding between and intent by the parties. GTL could have—as it had in the 2015 Settlement Agreement—included express contractual language to preserve certain claims, including those claims it then had in the Missouri Litigation against Platinum. GTL did not and instead agreed to terminate the

one provision, section 10, from the 2015 Settlement Agreement that might have preserved those claims.

A simple chronology underscores the significance of GTL's decision to terminate section 10. The parties entered the 2017 Settlement Agreement as part of the Cook County Litigation on February 28, 2017, but the Missouri Litigation began more than two months earlier, on December 8, 2016. Therefore, GTL knew of its Missouri Litigation claims well in advance of its agreement to resolve and settle "all claims that were filed or could have been filed in the Cook County litigation." Moreover, in formulating the 2017 Settlement Agreement, GTL and Platinum's express departure from the 2015 Settlement Agreement strongly suggests that—unlike the 2015 Settlement Agreement that reserved GTL's right to sue later for indemnification—GTL forfeited any indemnification rights relevant to Platinum. GTL's third-party complaint not only alleged indemnification claims but also premised those claims on the same allegations raised in the Cook County Litigation. All told, the express termination of the section 10 indemnification clause, coupled with the fact that GTL knew of any potential claims it had against Platinum in the Missouri Litigation prior to agreeing to the 2017 Settlement Agreement, solidifies our conclusion that GTL could have brought the third-party complaint claims in the Cook County Litigation.

Next, GTL's resort to certain contract recitals—introductory statements that commonly precede a contract to state a contract's purpose—in the 2017 Settlement Agreement falls short. Even if "recitals are not [an] operational part of [a] contract between the parties, they reflect the intent of the parties and influence the way the parties constructed the contract." *Hagene v. Derek Polling Constr.*, 902 N.E.2d 1269, 1274 (Ill. App.

Ct. 2009) (alterations in original) (quoting *First Bank & Tr. Co. of Ill. v. Village of Orland Hills*, 787 N.E.2d 300, 311 (Ill. App. Ct. 2003)); *see also Farmers Auto.*, 857 N.E.2d at 693 ("General words of release are restrained in effect by the specific recitals contained in the instrument."). Based on the recitals, GTL argues "it is unreasonable to interpret the Settlement Agreement as a general release relating to or arising out of claims unrelated to the arbitration dispute." GTL principally relies on paragraph D, which provides that "[t]o avoid further litigation costs and expenses, and without admitting any liability, the Parties now desire to settle the Arbitration and civil lawsuit according to the following terms." GTL points to *Gladinus v. Laughlin*, 366 N.E.2d 430 (Ill. App. Ct. 1977), to support its view that paragraph D's specific reference to the lawsuit should constrain the otherwise broad release later included in the 2017 Settlement Agreement. *See id.* at 432 ("Illinois courts will restrict the language of a general release to the thing or things intended to be released and refuse to interpret generalities so as to defeat a valid claim not then in the minds of the parties.").

GTL overstates *Gladinus*. In narrowly interpreting a broad release, the *Gladinus* court relied on factors including "very specific indicia of the parties' intent to restrict ostensibly broad language" and claim-specific coding. *See Crosby*, 949 F.3d at 361 (discussing *Gladinus*). The *Gladinus* court considered a settlement check given to the plaintiff to satisfy a property damage claim. *See* 366 N.E.2d at 431. On its back, the check also included a release of "all claims." *See id.* Despite this apparently general release, the court held the release did not preclude future litigation for personal injury claims. *See id.* at 432–33.

Later analyzing that case in *Crosby v. City of Chicago*, however, we noted that although the check contained a broad release on its back, the settlement check was still "coded for property damage with settlement amounts to match." 949 F.3d at 361. Specifically, the *Gladinus* "court held that the front of the check established 'the understanding of all concerned parties that the release affected her claim for property damage *only* and not her action for personal injuries.'" *Id.* (emphasis added) (quoting *Gladinus*, 366 N.E.2d at 432–33).

Even though the *Gladinus* court read the release before it to only apply narrowly, we reached a different conclusion in *Crosby*, in which we read a release contained in a settlement for § 1983 excessive force claims to apply broadly. *See id.* at 359. Crosby "agreed to do more than dismiss his existing suit with prejudice: he also agreed to release the [defendants] from liability for 'all claims he had, has, or may have in the future … arising either directly or indirectly out of the incident which was the basis of this litigation.'" *Id.* at 361 (some alterations in original). We accordingly dismissed Crosby's new lawsuit then before us, rejecting his *Gladinus*-based argument that "an agreement's reference to a specific claim always limits an otherwise general release to only the claim mentioned." *See id.* Indeed, "[i]t would have been odd for the settlement *not* to mention the underlying suit that prompted it; the desire to dispose of those claims is what drove the parties to the bargaining table." *Id.*

The language of the 2017 Settlement Agreement resembles the language of *Crosby* more than of *Gladinus*. Like Crosby's release of "all claims" he "may have in the future," *id.*, GTL released "all claims" that "could have been filed." This release does not contain the sort of narrowing language "coded" for

specific claims on which the *Gladinus* court relied to reach its different outcome. *See id.* Nowhere does paragraph D reflect an "understanding of all concerned parties that the release affected" GTL's claim against Platinum in the Cook County Litigation "only and not [GTL's] action" against Platinum for the same claims in other lawsuits. *See Gladinus*, 366 N.E.2d at 432–33. Even though the release mentions "Cook County Litigation," it plainly extends broadly to claims that "could have been filed" therein, including the claims now before us. Furthermore, the recital in paragraph D stating the parties' intent "to settle the Arbitration and civil lawsuit according to the following terms" does not provide "very specific indicia of the parties' intent to restrict ostensibly broad language" contained in the binding portion of the contract. *See Crosby*, 949 F.3d at 361. In fact, the recital necessarily incorporates the broad language of the contract's release in agreeing to resolve their dispute "according to the following terms." Finally, the mere mention of the "civil lawsuit" in paragraph D is insufficient, without more, to permit the narrowing construction GTL now seeks. "It would have been odd for the settlement *not* to mention the underlying" Cook County Litigation; "the desire to dispose of those claims is what drove the parties to the bargaining table." *Id.*

Finding the 2017 Settlement Agreement unambiguous, the district court correctly granted summary judgment to Platinum because the 2017 Settlement Agreement barred GTL from bringing the claims in its third-party complaint. Having determined that the agreement precludes GTL from bringing those claims, we need not address whether res judicata also barred those claims.

### B. Attorneys' Fees

The second issue on appeal is whether the district court's award of 150% of the ultimate relief secured as attorneys' fees was "reasonably proportionate." After the district court granted summary judgment for Platinum in its first order, Platinum invoked the 2017 Settlement Agreement to seek attorneys' fees of $210,476.25 based on the $72,296.73[4] in controversy. Applying the 2017 Settlement Agreement provision that "the prevailing Party in any lawsuit brought to enforce this Agreement shall be awarded its reasonable costs and attorneys' fees, but such an award must be reasonably proportionate to the ultimate relief secured by the prevailing Party," the district court concluded that, while reasonable, $210,476.25 was not a proportionate amount. Accordingly, the court reduced Platinum's requested attorneys' fees to $108,445.10 (or 150% of the $72,296.73 in relief secured).

Before turning to the merits of GTL's challenge to this decision, we must resolve the dispute over the appropriate standard of review. In its opening brief, GTL calls on us to apply de novo review because "[w]e review [a] court's interpretation of [a] contract[] de novo." *Chemetall GMBH v. ZR Energy, Inc.*, 320 F.3d 714, 720 (7th Cir. 2003). By contrast, Platinum argues for application of an abuse-of-discretion review because "[d]istrict courts have wide discretion in determining the appropriate amount of attorneys' fees and costs; therefore, our review of such determinations is limited to a highly deferential abuse of discretion standard." *Spegon v. Cath. Bishop of Chi.*, 175 F.3d 544, 550 (7th Cir. 1999).

---

[4] This is the sum of the amount paid to settle Grisham's claim and the amount paid to defend Grisham's claim.

In this case, the applicable standard of review turns on the nature of each individual argument. *See Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 307 (7th Cir. 2002) ("The proper standard of review depends on the character of the ruling sought to be reviewed."). Between its briefing and oral argument, GTL oscillates between the contention that "reasonably proportionate" requires a 1:3 proportion (necessitating a reduction by this Court in the amount of fees awarded)[5] and the contention that "reasonably proportionate" is ambiguous (necessitating a remand for the trial court to consider parol evidence to determine the parties' intent). GTL never reconciles these mutually exclusive views. We will first review de novo GTL's two arguments addressing the appropriate meaning of "reasonably proportionate." *Cf. Tax Track Sys. Corp. v. New Inv. World, Inc.*, 478 F.3d 783, 788 (7th Cir. 2007) ("The standard of review for the award of attorneys' fees has been the subject of some debate in this case. We review the meaning of the contract term 'substantially prevailing' de novo."). Rejecting both, we next turn to the appropriateness of the district court's award of attorneys' fees—the thrust of the parties' dispute—which we review for abuse of discretion. *See Anderson v. AB Painting & Sandblasting Inc.*, 578 F.3d 542, 544 (7th Cir. 2009) (applying abuse-of-discretion review to the award of fees but applying de novo review to the district court's legal analysis).

---

[5] At oral argument, GTL for the first time on appeal advocated that "proportionate" means a one-to-one ratio. GTL's tendency to alternate between different proportions only underscores that the parties intended the "reasonably proportionate" language to be applied, in the discretion of a judge, to the specific facts in a given dispute.

1. *The 2017 Settlement Agreement does not require an award in a 1:3 proportion.*

Without question, the parties did not, as GTL argues, intend for "reasonably proportionate" to exclusively mean a 1:3 proportion (or any other specific proportion). "[A] court cannot alter, change or modify existing terms of a contract, or add new terms or conditions to which the parties do not appear to have assented." *Thompson*, 948 N.E.2d at 51. Had the parties intended a one-third proportion, and *only* a one-third proportion, they would have said "such an award must be [*one third of*] the ultimate relief secured," and not, as they did, "such an award must be reasonably proportionate to the ultimate relief secured." We will not make that edit now.

The parties clearly intended a more malleable standard for determining attorneys' fees. Establishing *ex ante* that one proportion for attorneys' fees should govern all future legal disputes, regardless of the specific facts and issues at hand, makes little sense for sophisticated parties such as GTL and Platinum. Not all legal disputes are created equally: some can be resolved swiftly and therefore inexpensively while others present complex legal questions requiring substantial time and resources of the parties and their counsel.

The Illinois cases GTL cites to suggest that the 2017 Settlement Agreement requires a one-third proportion are inapposite. *See Will v. Nw. Univ.*, 881 N.E.2d 481, 488 (Ill. App. Ct. 2007) (affirming a "trial court's one-third fee award"); *Blankenship v. Dialist Int'l Corp.*, 568 N.E.2d 503, 508 (Ill. App. Ct. 1991) (same). In *Will*, the parties expressly contracted to permit a one-third contingency fee, thereby rendering that amount reasonable. 881 N.E.2d at 488. By contrast, GTL and Platinum here chose not to mandate a specific proportion, so

we are not confined to reading their contract as requiring a one-third proportion. In *Blankenship*, the court never considered proportionality as a factor in assessing attorneys' fees, so the case speaks only to the court's view that a one-third fee is permissible, if not "normal," *see* 568 N.E.2d at 508, which is not the same as saying it is the *only* acceptable proportion.

Finding no contractual language or case law supporting GTL's one-size-fits-all reading of the "reasonably proportionate" language, we decline to rewrite the parties' contract to say something it does not.

### 2. *The 2017 Settlement Agreement is not ambiguous.*

Beyond finding that "reasonably proportionate" does not necessitate a specific proportion, we also conclude the term is not ambiguous under relevant case law. "In Illinois, a contract is considered ambiguous if it is capable of being understood in more than one sense." *Cannon*, 752 F.3d at 1089 (citing *Whitlock*, 581 N.E.2d at 667; *Farmers Auto.*, 857 N.E.2d at 693). A contract deemed ambiguous may be submitted to a jury to determine the parties intent; however, "evidence [is] given to the jury" only when "objective evidence of ambiguity [is] presented first to the judge, and only if the judge concludes that it establishes a genuine ambiguity." *Home Ins. Co. v. Chi. & Nw. Transp. Co.*, 56 F.3d 763, 768–69 (7th Cir. 1995); *see also Whitlock*, 581 N.E.2d at 667 ("Where a court determines that a contract is ambiguous, its construction is then a question of fact, and parol evidence is admissible to explain and ascertain what the parties intended."). The district court below did not

find this contractual term to "establish[] a genuine ambiguity,"[6] *see Home Ins.*, 56 F.3d at 769, nor do we now.

As GTL helpfully illustrates, the disputed language, "reasonably proportionate," has a clear meaning. Despite encompassing a range of permissible amounts, it remains understood in a singular sense. Let us begin with the second word in the disputed phrase: "proportionate," from the root "proportion." Dictionaries define "proportion" to mean "the relation of one part to another or to the whole with respect to magnitude, quantity, or degree : relative size : RATIO." *Proportion*, Webster's Third New International Dictionary 1819

---

[6] GTL points to the following discussion by the district court to argue the district court found the contract ambiguous:

> Unfortunately, the contract language—"reasonably proportionate to the ultimate relief"—does leave some room for interpretation. The parties could have selected an exact ratio. For example, they could have said 50%, 100%, 150% of the total monetary value of the relief obtained. Or they could have imposed a percentage cap: no more than 150% or 200% of the monetary value. Or an overall cap: no more than $100,000 or $200,000 or even $1 million. Any of these elaborations would have made this Court's task easier. Another complication is the absence of any citations in the parties' briefs to case law applying proportionality language in a contract.

The district court does not state the contract language is *ambiguous* but rather states its view that the parties left to a judge the determination of appropriate attorneys' fees in particular disputes. In fact, the district court later found that "[p]erhaps this uncertainty is exactly what the parties intended and envisioned; if not, they should have chosen their words with greater precision." Accordingly, what GTL characterizes as ambiguous in the parties' contract, the district court appropriately read as entrusting it with discretion.

(1993); *see also Disproportionate*, Black's Law Dictionary 593 (11th ed. 2019) (defining *dis*proportionate as "[h]aving too much or too little in relation to something else; not suitable in comparison with something else in size, amount, importance, etc."). Furthermore, Illinois law, which governs interpretation of the contract before us, also encourages courts assessing attorneys' fees to consider "whether there is a reasonable connection between the fees and the amount involved in the litigation." *Kaiser v. MEPC Am. Props., Inc.*, 518 N.E.2d 424, 428 (Ill. App. Ct. 1987). Traditionally, consideration of proportionality is not mandatory under Illinois law, *see J.B. Esker & Sons, Inc. v. Cle-Pa's P'ship*, 757 N.E.2d 1271, 1277 (Ill. App. Ct. 2001) ("[A]ttorney fees may be reasonable even if the fees are disproportionate to the monetary amount of an award."), but the 2017 Settlement Agreement requires such consideration. Therefore, an award of attorneys' fees pursuant to that agreement must bear some "relation" to the relief secured.

The 2017 Settlement Agreement begs the obvious question: what "relation" is permissible? The first word in the disputed phrase, "reasonably," helps answer our open question and cabins the otherwise wide breadth (and potentially ambiguous reach) of "proportionate." *Black's Law Dictionary* defines the root word "reasonable" as "[f]air, proper, or moderate under the circumstances; sensible." *Reasonable*, Black's Law Dictionary 1518 (11th ed. 2019). Illinois law further illuminates the contours of "reasonably proportionate" because attorneys' fees must always be reasonable in Illinois based on a slate of eight factors (the "*Powers* factors").[7] Taking both

---

[7] "To determine a *reasonable* fee award, a court must consider (1) the skill and standing of the attorney employed, (2) the nature of the cause,

words in the disputed phrase together, attorneys' fees that must be "reasonably proportionate" to the ultimate relief translates to attorneys' fees that must bear a sensible relation to the ultimate relief under the *Powers* factors.

While "reasonably" (or "reasonably proportionate") encompasses a range of permissible values, it is nevertheless unambiguous, even under Illinois law.[8] The breadth of the phrase merely means that a range of proportions can share a sensible relation to the underlying relief secured,[9] and that

---

(3) the novelty and difficulty of the questions, (4) the amount and importance of the subject matter, (5) the degree of responsibility in the management of the case, (6) the time and labor required, (7) the usual and customary charges in the community, and (8) the benefits resulting to the client." *Powers v. Rockford Stop-N-Go, Inc.*, 761 N.E.2d 237, 240 (Ill. App. Ct. 2001) (emphasis added).

[8] The argument GTL makes that "reasonably proportionate" is ambiguous is more accurately characterized as an argument that the language is vague. *See* Lawrence B. Solum, *The Interpretation-Construction Distinction*, 27 Const. Comment. 95, 97–98 (2010). For present purposes, the words "reasonably proportionate" are vague, not ambiguous, which calls for contract construction, not interpretation. *Id.* at 98 ("[L]egal texts can (usually) be resolved by interpretation, but … vagueness always requires construction."); *id.* at 100 ("[I]nterpretation yields semantic content, whereas construction determines legal content or legal effect."). Therefore, the district court engaged in contract *construction* to "give[] legal effect to the semantic content of [the] legal text" in the 2017 Settlement Agreement. *See id.* at 103.

[9] A hypothetical helps illuminate this point. If a homeowner contracted with a painter to paint her house "reasonably blue," we would not say that contractual term is ambiguous; rather, we would say the parties intended to give the painter some leeway in choosing what color to paint the house. The painter could comply with the contract by using sapphire, cerulean, cobalt, indigo, or any other shade of blue paint. Clearly, though,

relationship should naturally ebb and flow with the complexity of and resources poured into a dispute.

The unambiguous character of "reasonable" is no better evidenced by its ubiquity in the law.[10] To suggest otherwise would sanction litigants artfully characterizing as ambiguous myriad legal terms of art. It would invite "fertile legal 'imagination [to] conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.'" *Grayned v. City of Rockford*, 408 U.S. 104, 110 n.15 (1972) (quoting *Am. Commc'ns Ass'n v. Douds*, 339 U.S. 382, 412 (1950)).

---

the painter could not use red paint. The language is broad—perhaps even vague—but not ambiguous.

Just as "reasonably blue" is not ambiguous because it encapsulates many shades of blue, "reasonably proportionate" is not ambiguous simply because it potentially encapsulates many proportions. None could say (and it would be an abuse of discretion for a district court judge to find) that a 1,000,000,000:1 ratio is "reasonably proportionate" because seldom would that relation be sensible to the ultimate relief. Nevertheless, a 3:2 ratio (adopted by the district court in this case) or a 1:3 ratio (endorsed by GTL) can both be "reasonably proportionate" to the relief secured in the same way that teal and navy can both be "reasonably blue." The parties could have *required* a 1:3 ratio just as the homeowner could have required teal paint; but the parties instead used language to permit a range of outcomes.

[10] *See, e.g.*, U.S. Const. amend. IV (prohibiting "unreasonable searches and seizures"); *Terry v. Ohio*, 392 U.S. 1, 10 (1968) (providing for a *Terry* stop upon an officer finding "reasonable suspicion"); Stephen G. Gilles, *On Determining Negligence: Hand Formula Balancing, the Reasonable Person Standard, and the Jury*, 54 Vand. L. Rev. 813, 822 (2001) ("For as long there has been a tort of negligence, American courts have defined negligence as conduct in which a reasonable man (nowadays, a reasonable person) would not have engaged.").

"Condemned to the use of words, we can never expect mathematical certainty from our language." *Id.* at 110. Accordingly, "reasonably proportionate," as broad a phrase as it might be, is not ambiguous. Rather, it unambiguously requires that attorneys' fees bear some sensible relation to the ultimate relief, leaving to the district judge the task of applying that language to the facts at hand.

> 3. *The district court did not abuse its discretion in awarding Platinum attorneys' fees amounting to 150% of the ultimate relief secured.*

Rejecting GTL's contention that a 1:3 proportion is required under the contract as well as GTL's attempt to make ambiguous the attorneys' fees provision, we are now left with assessing whether the district court selected a reasonably proportionate award. Distinct from any *interpretation* of the contract, which we reviewed de novo, the district court's decision to award attorneys' fees in the amount of 150% of the ultimate relief secured turned on its *construction* of that contract.[11] We therefore review how the district court applied and "enforced" the "reasonably proportionate" contractual language for abuse of discretion. *See Powers*, 761 N.E.2d at 240 ("[C]ontract provisions regarding attorney fees should be strictly construed and *enforced at the discretion of the trial court*." (emphasis added)). A district court enjoys "significant deference in fee matters because: (1) it possesses 'superior understanding of the litigation and [there exists a] desirability of avoiding frequent appellate review of what essentially are factual

---

[11] *See supra* note 8 (discussing the difference between contract interpretation and contract construction, with the latter referring to a court "giv[ing] legal effect to the semantic content of a legal text").

matters.'; (2) the need for uniformity in attorneys' fees awards is not great enough to warrant appellate review of minutia; and (3) the desirability of avoiding 'a second major litigation' strictly over attorneys' fees is high." *Spellan v. Bd. of Educ. for Dist. 111*, 59 F.3d 642, 645 (7th Cir. 1995) (alteration in original) (citations omitted) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)). We hold the district did not abuse its discretion.

Recognizing that the parties' contract requires any award be both reasonable and proportionate, the court disaggregated its analysis for each requirement. First, the district court found the requested attorneys' fees to be reasonable by applying the eight *Powers* factors. The thrust of its analysis turned on the fact that the amount requested, $210,476.25, reflected the actual amount billed *and paid* by Platinum in this complex litigation that would affect Platinum's potentially wide-reaching liability. *See Spegon*, 175 F.3d at 552 (concluding that fees may be reasonable if a "fee-paying client" would pay them). To that end, the district court relied on "detailed time sheets" and "affidavits that all of the attorneys' rates are what they customarily charge." *See Powers*, 761 N.E.2d at 240 (requiring consideration of "(7) the usual and customary charges in the community"). It also found that "counsel's skill showed throughout its management of the present action" and "brought many benefits to bear for their client." *See id.* (requiring consideration of "(1) the skill and standing of the attorney employed" and "(8) the benefits resulting to the client").

At the same time, the district court meaningfully engaged with and dismissed GTL's grievances about insufficient or questionable billing documentation. *See id.* (requiring consideration of "(3) the novelty and difficulty of the questions" and (6) the time and labor required"). The time sheets examined

by the district court revealed that Platinum's counsel properly separated billable from non-billable work. GTL argued that multiple partners working on this case was "duplicative," but the district court found this concern unwarranted because this was a "long-standing and multi-faceted dispute" where "the outcome of this smaller piece of the puzzle could have broader ramifications." Such a dispute naturally demands greater attention. Finally, the court reiterated Platinum's actual payment of the amount billed strongly supported the reasonableness of those fees.

Furthermore, the court addressed GTL's concerns that this low-stakes lawsuit does not warrant such a large award. *See id.* (requiring consideration of "(2) the nature of the cause" and "(4) the amount and importance of the subject matter"). A fee award of $210,476.25 is appreciably larger than the $72,296.73 at issue in this dispute, but that does not automatically render it unreasonable. As we have said:

> To say that a court should give "increased reflection" before awarding attorney's fees that are several times the amount of the actual damages is nothing more than to say that a comparatively large fee request raises a red flag. As we just said, in many cases the amount in controversy and the complexity of the case will track with one another. But small claims can be complex and large claims can be very straightforward. So while a fee request that dwarfs the damages award might raise a red flag, measuring fees against damages will not explain whether the fees are reasonable in any particular case.

*Anderson*, 578 F.3d at 546. Therefore, large awards are not per se unreasonable, even if they may presumptively "raise a red flag." *Id.* "[I]t is no surprise that the cost to pursue a contested claim will often exceed the amount in controversy." *Id.* at 545. In this case, the district court appropriately found the requested relief to be reasonable after consideration of the dispute's complexity and ramifications. Thus, it did not abuse its discretion.

Second, the district court turned to analyze whether the requested relief of $210,476.25 was reasonably *proportionate* to the $72,296.73 secured by Platinum. It concluded that the requested fees were not and reduced them to $108,445.10, or 150% of the ultimate relief secured. We hold this too was not an abuse of discretion.

As set forth above, Illinois courts permit consideration of proportionality in calculating attorneys' fees but do not require it. *See Kaiser*, 518 N.E.2d at 428; *J.B. Esker*, 757 N.E.2d at 1277. On appeal, GTL admits that in its "diligent research" it could not identify a similar "contractual fee-shifting provision [that] has been interpreted in any Illinois published decision or in the published decision of any other jurisdiction." The district court, also finding no Illinois case law speaking directly to how it should determine proportionate attorneys' fees, looked elsewhere. This approach is consistent with what an Illinois court confronted with the same dilemma might do. *See Racky v. Belfor USA Grp., Inc.*, 83 N.E.3d 440, 471 (Ill. App. Ct. 2017) ("While it is well settled that federal decisions are not binding on Illinois state courts, federal decisions can be considered to be persuasive authority, and they may be followed if we believe the federal analysis to be reasonable and logical." (citations omitted)).

Scouring the law for a useful analogue, the district court arrived at the Prison Litigation Reform Act ("PLRA"), which allows successful prisoner litigants to recover attorneys' fees so long as the fees are "proportionately related to the court ordered relief for the violation." 42 U.S.C. § 1997e(d)(1)(B)(i); *see also id.* § 1997e(d)(1)(A) (requiring the fee also be "reasonably incurred"). The PLRA language is meaningfully analogous to the current contract because both *require* proportionality in awarding attorneys' fees. The statute continues to cabin the size of potential awards by instructing that an award not be "greater than 150 percent of the judgment." *Id.* § 1997e(d)(2); *see also Pearson v. Welborn*, 471 F.3d 732, 742 (7th Cir. 2006) (applying this 150%-of-judgment cap to an award of fees).

The district court opted to rely on the PLRA, a federal law passed by Congress and signed by the President, as opposed to "simply plucking a number, or even a percentage, out of thin air." We find the federal analysis considered by the district court to be "reasonable and logical," such that an Illinois court could rely on it as persuasive authority. *See Racky*, 83 N.E. 3d at 471. The court therefore found $210,476.25 not reasonably proportionate to the relief secured and instead awarded Platinum $108,445.10, or 150% of the $72,296.73 in controversy. Seeing as the district court arrived at one (of potentially many) "reasonably proportionate" awards for attorneys' fees, we will not upset that discretionary decision. *See Powers*, 761 N.E.2d at 240.

For all these reasons, the district court did not abuse its discretion by deciding that $108,445.10 in attorneys' fees for Platinum was an amount "reasonably proportionate to the ultimate relief secured."

### III.    Conclusion

In summation, we AFFIRM the district court's entry of summary judgment for Platinum and its award to Platinum of $108,445.10 in attorneys' fees.